# EXHIBIT U

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Stanley Mosk Courthouse, Department 85

**23STCV26012**  March 28, 2024
**SONIA FELDMAN vs MARK ANTHONY SAWYER, et al.**  9:30 AM

Judge: Honorable James C. Chalfant                CSR: None
Judicial Assistant: J. De Luna                    ERM: None
Courtroom Assistant: C. Del Rio                   Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): Michael Machat (X)

For Defendant(s): Na'il Benjamin (Telephonic)

**NATURE OF PROCEEDINGS:** Hearing on Application for Writ of Attachment Against Defendant Mark Anthony Sawyer (CCP 484.040)

The court's tentative ruling is published to all parties via posting on the court's website.

The matter is called for hearing.

After argument of counsel, the court rules in accordance with its tentative ruling which is filed and adopted as the final ruling of the court and incorporated herein by reference.

Summary of the court's ruling:

Plaintiff Sonia Feldman ("Feldman") applies for a right to attach order against Defendant Mark Anthony Sawyer ("Sawyer") in the amount of $2,837,335.38.

The court has read and considered the moving papers and ex parte opposition (no subsequent opposition or reply was filed) and renders the following decision.

The application for a right to attach order is granted against Sawyer for $2,837,355.38. Feldman has already posted an undertaking.

Right to attach order is signed and filed this date.

Temporary protective order will expire on 04/04/2024 by close of business.

Notice is waived.

# DEPARTMENT 85 LAW AND MOTION RULINGS

**Case Number:** 23STCV26012    **Hearing Date:** March 28, 2024    **Dept:** 85

<u>Sonia Feldman v. Mark Anthony Sawyer et al.</u> 23STCV26012

Tentative decision on application for right to attach order: granted

Plaintiff Sonia Feldman ("Feldman") applies for a right to attach order against Defendant Mark Anthony Sawyer ("Sawyer") in the amount of $2,837,335.38.

The court has read and considered the moving papers and *ex parte* opposition (no subsequent opposition or reply was filed) and renders the following tentative decision.

A. **Statement of the Case**

1. **Complaint**

Plaintiff Feldman filed her Complaint on October 24, 2023 against Defendants Sawyer, dba MAS Financing, Gaelen Patrick Whittemore, aka Ben Whittemore ("Gaelen"), Sonja Domino Powell, aka Sonja Domino Whittemore, aka Domino Whittemore ("Domino") (collectively, Gaelen and Domino are referred to as the "Whittemores"), and the DND Family Trust ("DND"). The Complaint alleges causes of action for breach of contract, open book account, fraud, conversion, unjust enrichment, and unfair competition. The Complaint alleges in pertinent part as follows.

Gaelen, Feldman's mentor and teacher in the music industry, introduced her to Sawyer. Gaelen and his wife Domino explained to Feldman that their friend Sawyer was a "financial genius" who could help Feldman recover the financial losses she had incurred from prior, dishonest individuals in the music business. Feldman admits that she was naïve in trusting these individuals. She was only 23 years old when both of her parents had passed away, leaving her with over two million dollars in inheritance.

The Whittemores told Feldman that Sawyer could help Feldman regain the millions of dollars she had lost. They asserted that Sawyer was making a fortune with bridge loans earning interest of up to 19% over a 90-day period. Sawyer would use Feldman's money to make bridge loans that would earn high

interest.

When Feldman and Sawyer talked over the phone, he made the same promise as the Whittemores. He asserted that he would take the money people like Feldman invested with him, use it to make bridge loans to those in dire need of money, and use the profits from those loans to repay the investors with interest. The interest rates ranged from 11.6% to 16% over a 90-day period, or 76% annually. Sawyer backed the promise to repay with signed promissory notes.

On January 29, 2021, Feldman initiated a $10,000 loan to Sawyer for the purpose of making an investment through Sawyer's "bridge loan program." Sawyer signed and executed a promissory note, drafted by Domino, whereby Sawyer promised to pay Feldman back within 95 days. In exchange for value received, the promissory note provided that "on or before 05/04/2021 and without further notice, demand, or invoice from Feldman, Sawyer shall pay Feldman the fixed sum of $11,600."

The Whittemores had explained to Feldman that by "rolling the notes over and over," Feldman would be able to make back the millions she had lost. After the January promissory note was executed, Feldman did not exercise her option to have Sawyer pay her $11,600. Instead, on May 21, 2021, Feldman chose to "roll it over" into a new promissory note under which Feldman would be repaid $12,992 by August 26, 2021. Defendants had emphasized to her that was how she would make more money.

Feldman was so enraptured by Defendants that she opted to sell her home so she could invest the $1,166,337.13 proceeds in the program. On April 30, 2021, Feldman invested these proceeds with Sawyer, who signed a promissory note with the same terms and 95-day turnaround as the January promissory note. Feldman chose to roll over the $1,387,941.18 promised under this April promissory note into a new promissory note on August 20, 2021. Under this promissory note, Sawyer promised to pay Feldman $1,554,235.30 on November 20, 2021.

All the Defendants knew that Feldman would never see the $1,176,337.13 she had transferred to Sawyer because they would keep convincing her to roll over the proceeds. Feldman continued to invest for approximately two years.

In a promissory note dated February 17, 2023, Sawyer promised to repay Feldman $24,740.24 on May 22, 2023. This was the last promissory note in the series of rollovers from the $10,000 invested in January 2021. On March 10, 2023, Feldman and Sawyer signed one last promissory note in which Sawyer promised to repay $2,812,595 on June 10, 2023.

In the summer of 2023, Feldman requested repayment of $200,000. She was told that such a sum could not be withdrawn from Sawyer's bank account at any one time because Sawyer had mistakenly done a deal with money-launderers.

After more time lapsed, and Feldman had made more inquiries without avail, Feldman demanded to pull all her money out of the program. Defendants did not return Feldman's investment. A demand letter was sent to Sawyer to no effect.

Defendants have not used Feldman's money to make bridge loans. They used it for personal matters and planned to indefinitely lie to Feldman about her investment funds.

Feldman seeks (1) $3,149,689.67 based on breach of contract or an open book account, plus interest

at an annual rate of 10%; (2) $2,837,335.24 based on breach of contract, plus interest at an annual rate of 10%; (3) $1,176,337.13 plus treble punitive damages, plus interest at an annual rate of 10%; (4) on order prohibiting Defendants from holding themselves out to the public as financial advisors or loan agents, and from engaging in or working for any financial institution or loan agency; (5) actual, compensatory, and reliance damages, estimated to be $3,149,689.67; (6) transfer of the title of 1341 N. Evergreen Street, Burbank, CA 91505-2106 ("Property") from DND to Feldman, along with any other properties in the names of the Defendants or their trusts based on the doctrine of unjust enrichment; (7) punitive damages; and (8) attorney's fees and costs.

### 2. Course of Proceedings

On December 5, 2023, the Whittemores filed separate Answers.

On December 8, 2023, Feldman served Sawyer with the Complaint and Summons by substitute service, effective December 18, 2023.

On January 24, 2024, Department 40 (Hon. Anne Richardson) rejected Feldman's request for entry of default against Sawyer.

On February 6, 2024, Department 40 entered default against Sawyer.

On February 8, 2024, pursuant to Feldman's request, Department 40 dismissed the entire action against DND.

On February 13, 2024, the parties stipulated to set aside Sawyer's default.

On February 20, 2024, this court denied Feldman's *ex parte* application for a right to attach order against Sawyer but granted a temporary protective order ("TPO") and scheduled this hearing. There is no proof of service showing that the TPO has been served.

On February 23, 2024, Feldman filed an undertaking by posting a bond of $10,000.

### B. Applicable Law

Attachment is a prejudgment remedy providing for the seizure of one or more of the defendant's assets to aid in the collection of a money demand pending the outcome of the trial of the action. *See* Whitehouse v. Six Corporation, (1995) 40 Cal.App.4th 527, 533. In 1972, and in a 1977 comprehensive revision, the Legislature enacted attachment legislation (CCP §481.010 *et seq*.) that meets the due process requirements set forth in Randone v. Appellate Department, (1971) 5 Cal.3d 536. *See* Western Steel & Ship Repair v. RMI, (12986) 176 Cal.App.3d 1108, 1115. As the attachment statutes are purely the creation of the Legislature, they are strictly construed. Vershbow v. Reiner, (1991) 231 Cal.App.3d 879, 882.

A writ of attachment may be issued only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim or claims is a fixed or readily ascertainable amount not less than five hundred dollars ($500). CCP §483.010(a). A claim is "readily ascertainable" where the amount due may be clearly ascertained from the contract and calculated by evidence; the fact that damages are unliquidated is not determinative. CIT Group/Equipment Financing, Inc. v. Super DVD, Inc., (2004) 115 Cal.App.4th 537, 540-41 (attachment appropriate for claim based on rent calculation for lease of commercial equipment).

All property within California of a corporation, association, or partnership is subject to attachment if there is a method of levy for the property. CCP §487.010(a), (b). While a trustee is a natural person, a trust is not. Therefore, a trust's property is subject to attachment on the same basis as a corporation or partnership. Kadison, Pfaelzer, Woodard, Quinn & Rossi v. Wilson, *supra*, 197 Cal.App.3d at 4.

If the action is against a defendant who is a natural person, an attachment may be issued only on a commercial claim which arises out of the defendant's conduct of a trade, business, or profession. CCP §483.010(c). Consumer transactions cannot form a basis for attachment. CCP §483.010(c); Kadison, Pfaelzer, Woodard, Quinn & Rossi v. Wilson, (1987) 197 Cal.App.3d 1, 4 (action involving trust property was a commercial, not a consumer, transaction).

The plaintiff may apply for a right to attach order by noticing a hearing for the order and serving the defendant with summons and complaint, notice of the application, and supporting papers any time after filing the complaint. CCP §484.010. Notice of the application must be given pursuant to CCP section 1005, sixteen court days before the hearing. *See* ibid.

The notice of the application and the application may be made on Judicial Council forms (Optional Forms AT-105, 115). The application must be supported by an affidavit showing that the plaintiff on the facts presented would be entitled to a judgment on the claim upon which the attachment is based. CCP §484.030.

Where the defendant is a corporation, a general reference to "all corporate property which is subject to attachment pursuant to subdivision (a) of Code of Civil Procedure Section 487.010" is sufficient. CCP §484.020(e). Where the defendant is a partnership or other unincorporated association, a reference to "all property of the partnership or other unincorporated association which is subject to attachment pursuant to subdivision (b) of Code of Civil Procedure Section 487.010" is sufficient. CCP §484.020(e). A specific description of property is not required for corporations and partnerships as they generally have no exempt property. Bank of America v. Salinas Nissan, Inc., ("Bank of America") (1989) 207 Cal.App.3d 260, 268.

Where the defendant is a natural person, the description of the property must be reasonably adequate to permit the defendant to identify the specific property sought to be attached. CCP §484.020(e). Although the property must be specifically described, the plaintiff may target for attachment everything the individual defendant owns. Bank of America v. Salinas Nissan, Inc., (1989) 207 Cal.App.3d 260, 268.

A defendant who opposes issuance of the order must file and serve a notice of opposition and supporting affidavit as required by CCP section 484.060 not later than five court days prior to the date set for hearing. CCP §484.050(e). The notice of opposition may be made on a Judicial Council form (Optional Form AT-155).

The plaintiff may file and serve a reply two court days prior to the date set for the hearing. CCP

§484.060(c).

At the hearing, the court determines whether the plaintiff should receive a right to attach order and whether any property which the plaintiff seeks to attach is exempt from attachment. The defendant may appear the hearing. CCP §484.050(h). The court generally will evaluate the attachment application based solely on the pleadings and supporting affidavits without taking additional evidence. Bank of America, *supra*, 207 Cal.App.3d at 273. A verified complaint may be used in lieu of or in addition to an affidavit if it states evidentiary facts. CCP §482.040. The plaintiff has the burden of proof, and the court is not required to accept as true any affidavit even if it is undisputed. *See* Bank of America, *supra*, at 271, 273.

The court may issue a right to attach order (Optional Form AT-120) if the plaintiff shows all of the following: (1) the claim on which the attachment is based is one on which an attachment may be issued (CCP §484.090(a)(1)); (2) the plaintiff has established the probable validity of the claim (CCP §484.090(a)(2)); (3) attachment is sought for no purpose other than the recovery on the subject claim (CCP §484.090(a)(3); and (4) the amount to be secured by the attachment is greater than zero (CCP §484.090(a)(4)).

A claim has "probable validity" where it is more likely than not that the plaintiff will recover on that claim. CCP §481.190. In determining this issue, the court must consider the relative merits of the positions of the respective parties. Kemp Bros. Construction, Inc. v. Titan Electric Corp., (2007) 146 Cal.App.4th 1474, 1484. The court does not determine whether the claim is actually valid; that determination will be made at trial and is not affected by the decision on the application for the order. CCP §484.050(b).

Except in unlawful detainer actions, the amount to be secured by the attachment is the sum of (1) the amount of the defendant's indebtedness claimed by the plaintiff, and (2) any additional amount included by the court for estimate of costs and any allowable attorneys' fees under CCP section 482.110. CCP §483.015(a); Goldstein v. Barak Construction, (2008) 164 Cal.App.4th 845, 852. This amount must be reduced by the sum of (1) the amount of indebtedness that the defendant has in a money judgment against plaintiff, (2) the amount claimed in a cross-complaint or affirmative defense and shown would be subject to attachment against the plaintiff, and (3) the value of any security interest held by the plaintiff in the defendant's property, together with the amount by which the acts of the plaintiff (or a prior holder of the security interest) have decreased that security interest's value. CCP §483.015(b). A defendant claiming that the amount to be secured should be reduced because of a cross-claim or affirmative defense must make a *prima facie* showing that the claim would result in an attachment against the plaintiff.

Before the issuance of a writ of attachment, the plaintiff is required to file an undertaking to pay the defendant any amount the defendant may recover for any wrongful attachment by the plaintiff in the action. CCP §489.210. The undertaking ordinarily is $10,000. CCP §489.220. If the defendant objects, the court may increase the amount of undertaking to the amount determined as the probable recovery for wrongful attachment. CCP §489.220. The court also has inherent authority to increase the amount of the undertaking *sua sponte*. North Hollywood Marble Co. v. Superior Court, (1984) 157 Cal.App.3d 683, 691.

C. **Statement of Facts**

1. **Feldman's Evidence**

Feldman is a singer-songwriter. Feldman Decl., ¶1. In November 2018, Feldman met Defendant Gaelen Whittemore in a songwriting class that Gaelen was teaching. Feldman Decl., ¶3. Over time, Gaelen became Feldman's teacher and mentor. After confiding in Gaelen that she had spent over a million dollars on paying others to assist with her musical career, Gaelen shared with Whittemore that she hoped to be able to make the money back one day. Feldman Decl., ¶3.

Gaelen then introduced Feldman to his wife, Domino. Feldman Decl., ¶4. The Whittemores then introduced Feldman to Sawyer, and the three Defendants explained to Feldman that she could participate in Sawyer's bridge loan program. Feldman Decl., ¶4. Defendants said Feldman could recover the millions of dollars she previously lost through loaning money to Defendant Sawyer. Feldman Decl. ¶4.

After hearing Defendants' explanation how the bridge loan program worked, Feldman first transferred Sawyer $10,000 on or about January 29, 2021. Feldman Decl., Ex. C. In exchange for the funds, Feldman and Sawyer executed and signed a promissory note containing a provision promising Sawyer would pay Feldman $11,600.00 in return for the loan. Id. Sawyer's payment was due to Feldman on May 4, 2021. Id. During the pendency of the promissory notes, Defendants encouraged Feldman to "roll the notes over" for additional promissory notes and Feldman did so. Feldman Decl., ¶9. Feldman continued to transfer funds for two years, the most recent promissory notes being signed in February and March of 2023. Feldman Decl. ¶10.

On February 17, 2023, Defendant Sawyer executed a promissory note for the sum of $22,089.50. Feldman Decl., F. This promissory note had a 95-day loan period, making Sawyer's payment due to Feldman on May 22, 2023. Id. Feldman provides a copy of this promissory note which appears to have been created with "DocuSign" and evidences Mark Sawyer's signature. Id.[MC1]

On March 10, 2023, Sawyer executed a promissory note for the sum of $2,812,595.14. Feldman Decl. Ex. E. This promissory note had 90-day loan period, making its payment date June 10, 2023. Like the February promissory note, the June promissory note also appears to have been drafted through "DocuSign" and evidences Sawyer's signature. Id.

All the promissory notes had a provision calling for payment to be made to Feldman without further notice, demand, or invoice from her. Feldman Decl., Exs. A-B, E-F. By the summer of 2023 and after Feldman requested for the first time that she collect a payment to which she was entitled, Defendants informed Feldman that she would have to wait because the $200,000 she was requesting was not available. Feldman Decl., ¶¶ 11-12.

After Feldman inquired further, Gaelen informed her that Sawyer's funds were held up in the bank because he did busines[MC2] s with some people that were money laundering. Feldman Decl. ¶12, Exs. N-O. Feldman then demanded to be repaid. When Defendants maintained they did not have the funds, Feldman retained an attorney, Michael Machat, Esq. ("Machat"). Machat Decl., ¶¶ 12-14.

In a conversation with Machat following October 23, 2023, Sawyer told Machat that his accounts were frozen due to his business transactions with individuals who were arrested for money laundering but that they should be unfrozen soon. Machat Decl., ¶5, Ex. Machat requested the names of the arrested individuals, but, Sawyer claimed the names were confidential. Id.

On January 8, 2024, Machat issued a subpoena duces tecum to JPMorgan Chase Bank to trace the funds transferred from Feldman to Defendant's account. Machat Decl., ¶8. On Sawyer's May 2021 bank statement shows that on May 7, 2021 Feldman's check was deposited into his bank account. Machat Decl., Ex. L. The next day, May 8, 2021, the funds tracing back to Feldman were used to write a check to the Vegas Auto Gallery for $925,000. Machat Decl., ¶9; Ex. L, check # 454. On May 17, 2021, Sawyer wrote check number 456 to the Vegas Auto Gallery for $100,000. Machat Decl. Ex. L. Sawyer made payroll payments of $10,763.04 and $11,166.42 ,on May 14, 2021 and May 18, 2021, respectively. Machat Decl., Ex. L. Sawyer also wrote checks in the amounts of $1,000,000, $500,000, and $200,000 to the Vegas Auto Gallery. Machat Decl., Ex. M. Two more checks in the sums of $1,000,000 and $500,00, show that Sawyer acquired an equity position in the Vegas Auto Gallery. The back of the checks show that Vegas Auto Gallery is the dba of Haute Auto Group LLC. Machat Decl., ¶11.

Sawyer's website for his business, MAS Financing, is Sawyer's money lending business, demonstrating he lends money in the capacity of a commercial lender. Machat Decl., ¶7.

Attorney Chadwick Johnson contacted Machat on January 17, 2024, and shared the same pattern of bridge loan lending followed by communications expressing that the funds are tied up with the banks but should be released soon. Machat Decl., ¶15-17, Ex. N. Machat has been contacted by Chadwick Johnson, Lakisha R. Washington, Bryant Hu, and Stephen S. Chang, each individuals and/or attorneys of individuals reporting similar experiences to Feldman. Machat Decl., ¶¶ 15-21. Exs. N-Q.

### D. Analysis

Plaintiff Feldman applies for a right to attach order against Defendant Mark Sawyer in the amount of $2,837,355.38. Sawyer filed an opposition to the *ex parte* application but no additional opposition has been filed.

#### 1. A Claim Based on a Contract and on Which Attachment May Be Based

A writ of attachment may be issued only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim or claims is a fixed or readily ascertainable amount not less than five hundred dollars ($500). CCP §483.010(a).

Feldman claims $2,837,355.38 for breach of Sawyer's obligations in the two promissory notes made on March 10, 2023, and May 22, 2023 for $2,812,595.14 and $24,740.24, respectively. Feldman Decl., Ex. E-F. Thus, Feldman has two contract claims on which to base attachment.

#### 2 . An Amount Due That is Fixed and Readily Ascertainable

A claim is "readily ascertainable" where the damages may be readily ascertained by reference to the contract and the basis of the calculation appears to be reasonable and definite. CIT Group/Equipment Financing, Inc. v. Super DVD, Inc., (2004) 115 Cal.App.4th 537, 540-41. The fact that the damages are

unliquidated is not determinative. Id. But the contract must furnish a standard by which the amount may be ascertained and there must be a basis by which the damages can be determined by proof. Id. (citations omitted).

### a. Breach of Contract

The promissory note dated February 17, 2023 provides for a payment due date on May 22, 2023. Feldman Decl., Ex. F. The promissory note identifies the Borrower as "Mark A. Sawyer" and the Lender as "Sonia Feldman." Feldman. Decl. Ex. F. The "Total Amount Due on Payment Due Date is $24,740. 24. Feldman Decl. Ex. F. Any portion of the $24, 740.24 not paid in full shall accrue late charges at the rate of 10% per annum until paid. Feldman Decl., Ex. F.

The promissory note dated March 10, 2023 provides for a payment due date on June 10, 2023." Feldman Decl., E. The contract identifies the Borrower as "Mark A. Sawyer" and the Lender as "Sonia Feldman." Feldman. Decl. Ex. E. The "Total Amount Due on Payment Due Date is $2, 812, 595.14. Feldman Decl. Ex. E. Any portion of the $2,812,595.14 not paid in full shall accrue late charges at the rate of 10% per annum until paid. Feldman Decl., Ex. E., Feldman Decl., E-F.

As both dates have passed and Feldman has not yet received payment, both promissory notes are in breach. Feldman demonstrates breach of contract in the readily and ascertainable amounts of $24, 740.24 and $ $2,812,595.14, respectively. Feldman Decl., Exs. E-F. The total damages of $2,837,355.38 are readily ascertainable.

### 3. Probability of Success

A claim has "probable validity" where it is more likely than not that the plaintiff will recover on that claim. CCP §481.190. In determining this issue, the court must consider the relative merits of the positions of the respective parties. Kemp Bros. Construction, Inc. v. Titan Electric Corp., (2007) 146 Cal.App.4th 1474, 1484. The court does not determine whether the claim is actually valid; that determination will be made at trial and is not affected by the decision on the application for the order. CCP §484.050(b).

On February 17, 2023 and March 10, 2023, Feldman and Sawyer entered into two contracts in the form of promissory notes. Feldman, Decl., Exs. E-F. Both contracts provide for payment, without an affirmative need for demand, in the amounts of $24,740.24, and $2,812,595.14. Id. The respective due dates of May 22 and June 10, 2023 have both passed. Feldman has provided evidence of continued demands for payment. Machat Decl. Ex. D, G, and J.

Sawyer's opposition argues on the merits that the nature of his business activity with Feldman was bridge loans and the third party borrowers have Feldman's funds. Otherwise, Feldman's evidence shows that an auto business has her funds. Ex Parte Opp. at 5.

This argument is spurious. What Sawyer did with Feldman's money bears on her fraud claim[1] but not her breach of contract claim. She loaned money to Sawyer who did not repay it.

Thus, Feldman has demonstrated a probability of success on the merits.

### 4. Attachment Based on Commercial Claim

If the action is against a defendant who is a natural person, an attachment may be issued only on a commercial claim which arises out of the defendant's conduct of a trade, business, or profession. CCP §483.010(c). Consumer transactions cannot form a basis for attachment. CCP §483.010(c); Kadison, Pfaelzer, Woodard, Quinn & Rossi v. Wilson, ("Kadison") (1987) 197 Cal.App.3d 1, 4 (action involving trust property was a commercial, not a consumer, transaction).

These terms "trade," "business," and "profession" encompass almost any activity engaged in for profit with "frequency and continuity." Advance Transformer Co. v. Superior Court, (1974) 44 Cal.App.3d 127, 139. The purpose of the attachment statutes is to confine attachment to commercial situations and prohibit their use in consumer transactions. Kadison, supra, 197 Cal.App.3d at 4.

Sawyer is the borrower on both promissory notes. Feldman Decl., Exs E-F. All Defendants, including Sawyer, represented to Feldman that Sawyer was receiving and rolling over" Feldman's loans through his Bridge Loan Program. Feldman Decl., ¶¶ 4-5. Sawyer's website demonstrates that he is in the money lending business. Machat Decl., Ex. J. The claim against Defendant Sawyer is a commercial claim.

### 5. Description of Property to be Attached

Where the defendant is a natural person, the description of the property must be reasonably adequate to permit the defendant to identify the specific property sought to be attached. CCP §484.020(e). Although the property must be specifically described, the plaintiff may target for attachment everything the individual defendant owns. Bank of America v. Salinas Nissan, Inc., (1989) 207 Cal.App.3d 260, 268. The requirement of specificity avoids unnecessary hearings where an individual defendant is willing to concede that the described property is subject to attachment. Ibid. A general list of categories - e.g., "real property, personal property, equipment, motor vehicles, chattel paper, negotiable and other instruments, securities, deposit accounts, safe-deposit boxes, accounts receivable, general intangibles, property subject to pending actions, final money judgments, and personal property in decedents' estates" – is sufficient. Ibid.

Feldman seeks to attach Sawyer's interest in any real property, cash deposits in bank accounts, and inventory. The description of these three categories is adequate.

### 6. Attachment Sought for a Proper Purpose

Attachment must not be sought for a purpose other than the recovery on the claim upon which attachment is based. CCP §484.090(a)(3). Feldman seeks attachment for a proper purpose.

### 7. Undertaking

Before issuance of a writ of attachment, the plaintiff shall file an undertaking to pay the defendant any amount the defendant may recover for any wrongful attachment by the plaintiff in the action. CCO §489.210.

On February 23, 2023, Feldman filed an undertaking that was executed and signed February 20, 2024 with Colonial Surety Company for a bond in the amount of 10,000, as requested by the Court. Feldman Undertaking.

### E. Conclusion

The application for a right to attach order is granted against Sawyer for $2,837,355.38. Feldman has already posted an undertaking. Feldman has not provided a proposed right to attach order after hearing and is ordered to do so within two court days or it will be waived.

---

[1] Feldman has provided evidence of communications with other individuals and their attorneys, demonstrating Feldman's claim against Defendants may be part of a larger scheme of fraud. Machat Decl., Exs. N, O, P, and Q.

---

[MC1] "they provide" is like "they assert" - no naw to say that about the declaration in the SOF.

[MC2] See the footnote above about how we're doing this